**In re SUNRIVER FARMS, INC., Debtor.**

**KLEIN BROS., INC., a California corporation, Plaintiff,**

**v.**

**FIRST INTERSTATE BANK OF OREGON, N.A., et al., Defendants.**

Bankruptcy No. 380–03279.
Adv. No. 81–0189.

United States Bankruptcy Court,
D. Oregon.

Aug. 19, 1982.

Gary W. Lindberg, Douglas M. Ragen, Portland, Or., for First Nat'l. Bank.

Daniel M. Ricks, Portland, Or., James M. Morris, Stockton, Cal., for plaintiff.

Elizabeth Perris, Portland, Or., for trustee-defendant.

Lawrence B. Rew, Pendleton, Or., for Pendleton Grain Growers.

Norman Wapnick, Portland, Or., for Mervin Leonard.

HENRY L. HESS, Jr., Bankruptcy Judge.

This adversary proceeding concerns the rights of plaintiff, Klein Bros., Inc. ("Klein Bros.") and defendant First Interstate Bank of Oregon ("Bank") to certain proceeds of pinto beans sold by Sunriver Farms, Inc., ("Sunriver") the debtor, to Klein Bros.

During 1980, Sunriver sold and delivered its entire harvest of 93,400 cwt. bags of U.S. Grade No. 1 and 2 pinto beans to Klein Bros. at the contract price for a total of $2,541,000 of pinto beans sold to Klein Bros. (Agreed Fact 14). Klein Bros. paid $1,427,-000.00 to Bank and Sunriver jointly, (Agreed Fact 18) leaving a balance of $1,114,000.00 for beans that were delivered to Klein Bros. but not paid for. The parties agree that from this sum Klein Bros. is entitled to credits for $47,840,87 paid to Empire Seed Company, the sum of $48,000 representing bean seed, a further sum of $16,000, the sum of $110,000 paid to Wilbur Ellis Company, and $236,707.65 paid to the Bank from monies deposited into court by Klein Bros. Deduction of these credits leaves a balance of $655,451.48 not paid. Klein Bros. asserts that it is entitled to further credits of $425,112.50 for "cover", $240,000 for a check made payable solely to Sunriver, and $85,603.77 for wheat seed furnished. The Bank denies that these last three items constitute appropriate credits. The parties agree that Klein Bros. must pay any sums found to be due Pendleton Grain Growers (PGG) upon an agricultural lien upon the pinto bean crops and that Klein Bros. would be entitled to a credit against the balance owing to the bank by virtue of any such payment to PGG.

The crops in question were raised on property in Morrow County, Oregon, known as Sabre Farms or Sabre Division and on property in Benton County, Washington, known as the Three-Wells Farm or Three-Wells Division.

Bank loaned money to Sunriver for farming operations from time to time beginning December 7, 1979. As part of these loan transactions, Bank obtained security agreements and filed financing statements as follows:

| DATE | DOCUMENT | WHERE FILED |
|---|---|---|
| Executed 12/7/79 | Security Agreement (Def. Ex. #1) | |
| Filed 12/11/79 | Financing Statement (Def. Ex. #2) | Secretary of State, Orgeon |
| Filed 6/27/80 | Financing Statement (Def. Ex. #5) | Auditor, Benton County, WA |
| Filed 7/1/80 | Financing Statement (Def. Ex. #4) | Uniform Commercial Code Division, Olympa, WA |
| Executed 7/3/80 | Security Agreement (Def. Ex. #3) | |

The security agreements provide that Bank is granted a security interest in all of Sunriver's existing and after-required assets, proceeds and products, including crops grown, growing or to be grown on lands owned, leased, or controlled by Sunriver. (Defendant Exhibit # 1, 3) Legal descriptions of those lands were attached to and incorporated in the security agreements and financing statements. The first financing statement filed December 11, perfected the security interest in all assets of Sunriver, including crops grown on lands in Morrow County, Oregon, known as Sabre Farm which, at that time was land leased to and farmed by Sunriver as lessee. Sunriver subsequently acquired ownership of the Sabre Farm. During 1980, Sunriver expanded its operations to Benton County, Washington, where it leased land known as the Three-Wells/Hundred Circle Farm.

On March 6, 1980, Sunriver and Klein Bros. entered into a contract of sale (Pl.Ex. # 3) in which Sunriver agreed to sell to Klein Bros.:

"THE FIRST FIFTEEN (15) SACKS OF PINTO BEANS PER ACRE GROWN ON: SABRE FARMS RANCH IN OREGON AND THE THREE–WELLS RANCH IN WASHINGTON. ACREAGE TO BE DETERMINED BY JULY 1, 1980, AND RECORDED IN THE VARIOUS COUNTIES. MAXIMUM ACREAGE ON BOTH FARMS NOT TO EXCEED 13,000 ACRES.

*    *    *    *    *    *

"ANY ADDITIONAL BEANS PRODUCED ON THE ACREAGE SHOWN ABOVE, THE MAXIMUM ACREAGE CONTRACTED, KLEIN BROS. INC. TO HAVE THE MARKETING RIGHTS. FOR PURPOSE OF CLARIFICATION, IF 13,000 ACRES ARE PLANTED, KLEIN BROS., INC. WILL RECEIVE THE FIRST 195,000 BAGS AT CONTRACTED PRICE, AND AND [SIC]

WILL HAVE THE RIGHT TO MARKET ANY ADDITIONAL PRODUCTION."

Thirteen thousand acres of beans were planted by July 1, 1980. However, only 93,400 sacks were harvested, slightly over 7 sacks per acre.

The contract includes price terms and provides:

"FOR SHIPMENT AS RECLEANED, OR SEPTEMBER/OCTOBER/NOVEMBER SELLER'S OPTION."

"PAYMENT TO BE MADE FIFTEEN (15) DAYS AFTER SHIPMENT AND COMPLETE CORRECT SET OF SHIPPING DOCUMENTS FORWARDED TO KLEIN BROS. INC."

A miscellaneous provision of the contract deals with default:

"In the event Buyer makes defaults in any payment to Seller, or becomes insolvent, or if a receiver is appointed for all or part of Buyer's assets, or a Petition in Bankruptcy (either voluntarily or involuntarily) is filed against Buyer, Seller may at its option and without notice, forthwith cancel all or part of any unfilled portion of this contract and further, in the event of nonpayment, costs of collection including reasonable attorney fees, to be paid by the Buyer."

Prior to the contract of March 6, 1980, Sunriver and Klein Bros. had entered a contract dated February 14, 1980 which provided:

"Purchase of approximately 7,500 acres or entire recleaned production of approximately 150,000 bags recleaned 1980 crop No. one pinto beans

" . . .

"This contract may be increased by seller, by giving us written notice of any additional acreage that he may wish to include

"Buyer has an option to accept or reject additional acres over 10,000 total

"Any portion of the production of this contract over and above the 7,500 acres will be considered joint account with Klein Bros. & Sunriver Farms. Mr. Ray McCoy to keep us advised as to cost of contracted additional acreage."

The bank was aware of both the February 14, 1980 and the March 6, 1980 contracts shortly after each was entered and prior to perfection of its security interest in the crop raised on the Three-Wells Farm in Benton County, Washington by the filing of its financing statement in Benton County on June 27, 1980 and the execution of the security agreement of July 3, 1980.

As a part payment for beans sold to Klein Bros. it issued its check number 2330 on September 8, 1980 payable to Sunriver (but not jointly with the bank) for $240,000. Sunriver received the check and endorsed it over to Morrow Ag Energy, Inc., ("Morrow Ag"), an affiliated company. In September, 1980 Morrow Ag paid $185,000 to Columbia Improvement District ("CID") for charges incurred by Sunriver. In October, 1980, Morrow Ag paid an additional $47,-147.17 to CID for charges incurred by Sunriver. These charges were not a budgeted item of expense and were not included in the crop financing commitment by Bank to Sunriver. (Vol. IV, pp. 26 and 27).

On September 22, 1980, Bank notified Klein Bros., of its objection to Klein Bros. failure to include Bank as co-payee on those two checks. Klein Bros. acknowledged to Bank its error and promised to make checks payable to Bank and Sunriver in the future. (Vol. III, pp. 84–87) (Vol. III, pp. 77–79).

Sunriver's last invoice for pinto beans delivered to Klein Bros. was dated October 31, 1980. (Agreed Fact 19) With the exception of 890 bags, which are not an issue here, no other beans were delivered to Klein Bros. by Sunriver between October 31, 1980, and November 30, 1980. (Vol. III, p. 30). Klein Bros. made no payments after November 7, 1980, for beans already delivered and invoiced by Sunriver. (Agreed Fact 19).

On November 7, 1980, Klein Bros. sent a mailgram to Sunriver demanding assurances of performance pursuant to ORS 72.-6090. (Vol. III, p. 28).

On November 26, 1980, Bank sent a letter to Klein Bros. demanding payment of the balance of $1,139,750.00. (Vol., III, p. 45)

Between December 1, 1980 and December 18, 1980, Klein Bros. purchased 101,600 cwt. bags of pinto beans and pink beans. Klein Bros. claims these purchases were "cover" for the pinto beans not delivered by Sunriver. The cost of said 101,600 cwt. bags of pinto and pink beans was $425,112.50 more than contract price of 101,600 cwt. bags of pinto beans of grade 1 under the contract between Klein Bros. and Sunriver. (Agreed Fact # 10) As Klein Bros. made such purchases, it calculated the difference between the price paid for the "cover" beans and the price which would have been paid for Sunriver pinto beans.

## COVER

Regarding Klein Bros. claim of an offset of $425,112.50 for "cover" the plaintiff contends that the March 6 contract required Sunriver to deliver at least 15 bags of beans per acre from 13,000 acres or a total of 195,000 sacks. On the other hand the defendant contends that the contract required Sunriver to deliver the entire crop of beans harvested from the acreage planted up to 15 sacks per acre, required Klein Bros. to purchase the first 15 sacks per acre at the contract price and gave Klein Bros. the right to market for Sunriver any excess over 15 sacks per acre, but provided no minimum amount to be delivered by Sunriver should the crops harvested be less than 15 sacks per acre.

In resolving this dispute the court must first determine whether the contract contains an ambiguity. If an ambiguity existed it would be appropriate to receive extrinsic evidence of the intent of the parties. On the other hand, if the contract is not ambiguous it would be inappropriate to consider extrinsic evidence of the intent of the parties if the effect of such evidence would be to vary the unambiguous provisions of the contract.

It is clear that the contract obligated Klein Bros. to purchase all of the production up to 15 sacks per acre at the contract prices from a maximum of 13,000 acres, or a total maximum of 195,000 cwt. sacks. It provides no obligation to purchase any production exceeding 15 sacks per acre from a maximum acreage of 13,000 acres. Thus the maximum obligation of Klein Bros. is fixed not only by a limit upon the number of acres to be planted but to 15 sacks for each acre planted. The contract, by its express terms, does not fix a minimum number of acres to be planted. The language "Maximum acreage on both farms not to exceed 13,000 acres" implies a right on the part of Sunriver to plant less than 13,000 acres. The language "For the purpose of clarification, if 13,000 acres are planted * * * " also implies a right to plant less than 13,000 acres. Thus, it cannot be said that the contract provided a guarantee by Sunriver that it would deliver at least 195,000 sacks whether produced or not. The language "The first 15 sacks of pinto beans per acre grown on * * * " obviously fixes a maximum quantity which Sunriver was obligated to supply. Had the parties contemplated an obligation to deliver a fixed quantity of 195,000 bags, or some other quantity, the contract would not have contained an example that uses the figure of 195,000 sacks. Nor would it have been necessary to limit the purchase to 15 sacks per acre. Nor would it have been necessary to limit the number of acres to be planted. If it had been intended that Sunriver had the obligation to furnish a fixed quantity of beans, whether or not the yield amounted to at least 15 bags per acre, there would have been no need to use the term "the first 15 sacks" nor to limit the number of acres to be planted to 13,000 acres.

■ The court therefore finds that the contract fixed the maximum obligation of Klein Bros. to the purchase of 195,000 sacks but fixed no minimum delivery requirement on the part of Sunriver, and that the contract is not ambiguous.

In the absence of an ambiguity in a contract, extrinsic evidence may be admissible to determine the intent of the parties for some limited purposes.

ORS 72.2020 provides as follows:

"Terms with respect to which the confirmatory memorandum of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein, may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement, but may be explained or supplemented

"(a) by a course of dealing or usage of trade (ORS 71.2050) or by a course of performance (ORS 72.2080); and

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

In the comments which follow ORS 72.2020, the following language appears:

"1. This section definitely rejects:

" . . .

"(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous."

Comment 2. to ORS 72.2020 contains the following language:

"Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean."

ORS 71.2050(1) defines a course of dealing as:

"a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a basis of understanding for interpreting their expressions and other conduct."

A comparison of the terms of the March 6, 1980 contract with the terms of the February 14, 1980 contract demonstrates that Klein Bros. was at all times concerned with fixing a maximum quantity which it would obligate itself to purchase, but did not seek a guarantee of delivery of any minimum quantity.

In its February 14 contract Klein Bros. agreed to purchase the entire production but limited the number of acres. In the March 6 contract it limited the quantity which it was obligated to purchase not only by limiting the number of acres but by limiting the maximum quantity per acre. Neither contract however contains any language implying any agreement that Sunriver was to deliver anything more than the actual production, whatever it might be. There therefore was no prior "course of dealing" which would tend to indicate that the March 6, 1980 contract provided any minimum guarantee on the part of Sunriver.

The course of dealing and course of performance of the parties after the March 6, 1980 contract is not itself free from ambiguity. The fact that Klein Bros. took some effort to monitor the progress of the crop and its harvesting does not, of itself, indicate a guaranteed minimum. Without such a minimum Klein Bros. could have been interested in estimating the amount of production to be expected in order to determine whether it should enter the market to meet commitments it may or may not have made. With market fluctuations in price, the timing of additional purchases by Klein Bros. might have been felt to be important. If prices in the market at the time of harvest exceeded the contract price Klein Bros. would have had an interest in doing what it could to assure that the harvest would result in at least 15 sacks per acre. If it had been understood by the parties that the March 6 contract fixed a minimum quantity to be delivered, Klein Bros. would have had less interest in estimating the crop prior to harvest or in making recommendations concerning harvesting methods since it would have been the obligation of Sunriver to enter the market and purchase any shortfall in order to comply with such a guarantee. That both Sunriver and Klein Bros. expected at the time the contract was entered that the yield would exceed 15 sacks per acre is not evidence that Sunriver was guaranteeing the delivery of not less than 15 sacks per acre. That Sunriver expected to profit if the crop exceeded 15 sacks and the market price then exceeded the contract price is likewise not evidence of a guaranteed minimum.

There was no evidence relating to usage of trade to indicate that it was common practice for a farmer to guarantee delivery of farm products in excess of the farmer's actual production. In view of the vagaries of weather and other uncontrollable risks facing a farmer which determine yields, the court suspects that it would be the exception rather than the rule for the farmer to guarantee a minimum quantity to be delivered to a buyer.

ORS 72.2020(2) permits receipt of extrinsic evidence of consistent additional terms unless the court finds the writing to have been intended to be a complete and exclusive statement of the terms of the agreement. In this case the failure of the March 6, 1980 contract to contain a guaranteed minimum quantity of beans implies that the parties did not intend such a guarantee. Extrinsic evidence tending to show the parties intended such a guarantee would not be evidence of "consistent additional terms." Nor would such evidence tend to explain or supplement the express terms of the contract. There was no evidence that the parties had had any dealings before the contract of February 14, 1980. There was therefore no evidence from either prior dealings or usages of trade from which the court could find that the parties took for granted that Sunriver was guaranteeing any minimum delivery without need for such a provision in the contract.

The plaintiff argues that conduct by the parties tended to show a requirement to deliver 195,000 sacks. Exhibit 33 outlining the steps which Sunriver expected to follow in the raising and harvesting of the crops does not amount to evidence of a guarantee. That Klein Bros., Sunriver and the Bank were interested in production of 15 sacks per acre or more was not inconsistent with lack of a guaranteed minimum. When it appeared that problems had developed in the harvesting operation and that less than 15 sacks per acre might be obtained Klein Bros. made written demand on November 7, 1980 for assurance that it would be furnished 195,000 sacks. (Ex. 38) By this time the market price was higher than the contract price. It was then in Klein Bros. interest to receive at least 195,000 sacks. But this demand did not constitute a course of dealing or performance. A course of dealing or performance is an action taken by one party with the consent or acquiescence of the other. Action by one party which is not consented to or acquiesced in by the other party does not constitute a course of dealing or performance between the parties.

■ While a course of dealings or performance of the parties may be referred to in determining the meaning of terms used in a contract, evidence of a course of conduct may not be used to impeach the clear meaning of terms used.

Since the March 6, 1980 contract did not obligate Sunriver to deliver at least 15 sacks per acre and since the entire crop actually produced was delivered to Klein Bros., there was no breach of the contract by Sunriver in failing to deliver a total of 195,000 sacks. Since failure to deliver 195,000 sacks did not constitute a breach, Klein Bros. had no claim against Sunriver for "cover" or the cost to Klein Bros. of the purchase of beans on the open market in excess of the contract price for the difference between 195,000 sacks and the number of sacks actually delivered by Sunriver. Klein Bros. is therefore not entitled to its claimed offset of $425,112.50 for "cover".

## EXTENT OF BANK'S SECURITY INTEREST

As previously noted the Bank had perfected its security interest in the crop on the Sabre Farm prior to the March 6, 1980 contract but perfected its security interest in the crop on the Three-Wells Farm thereafter when it had knowledge of the contract. All of the crops had been planted prior to the Bank's perfection of its security interest in the crops on the Three-Wells Farm. The evidence indicated that of the entire crop delivered to Klein Bros. approximately two thirds came from the Three-Wells Farm and one-third from the Sabre Farm. Klein Bros. concedes that commingling the crops from the two farms would not defeat the security interest of the Bank to that portion in which it has a security interest. Klein Bros. however contends that its contract rights take priority over the security interest in the crop from the Three-Wells Farm.

There was no evidence presented to show that Klein Bros. had actual knowledge of a security interest of the Bank in the crops to be grown in Washington at the time of the contract of March 6 or at the time of the planting of the crop. Klein Bros. however did have actual knowledge of the Bank's claim of a security interest in the crops in Washington prior to shipment by Sunriver to Klein Bros. of any beans from either the Sabre farm in Oregon or the Three Wells farm in Washington.

Had the goods in question been other than farm products Klein Bros. would have received beans free of the security interest of the bank even if the security interest had been perfected and even if Klein Bros. knew of the existence of the security interest. ORS 79.3070(1) and RCW 62A. 9–307(1) provides:

"A buyer in ordinary course of business as defined in ORS 71.2010(a), other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

In the case of non farm goods ORS 79.-3070(1) speaks of *prior* security interests. It does not speak of security interests created after sale to buyers in the ordinary course for what would seem to be an obvious reason. When a security interest is taken in goods of a debtor who is engaged in the sale of such goods, the lender would obviously be aware that the debtor could not grant a security interest which exceeded his interest in the goods. A security interest can attach only to the extent of the interest of the debtor.

The Uniform Commercial Code does not specifically address the question of priority between the holder of a security interest and a purchaser in the ordinary course when the goods are farm products. Sections of the UCC other than ORS 79.3070 must therefor be viewed.

ORS 72.1030(1)(a) states that a " 'Buyer' means a person who buys or contracts to buy goods." Under ORS 71.2010(9) a buyer in ordinary course of business includes one buying on credit but does not include one who purchases with knowledge that the sale is in violation of a security interest of a third person. This same section includes "receiving goods * * * under a pre-existing contract for sale." ORS 72.4010 provides that provisions of chapter 2 regarding sales with regard to rights, obligations and remedies of the seller, the buyer, the purchaser or other third parties, applies irrespective of title to the goods except where the provision refers to such title.

"Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell." ORS 72.1050(2).

Under ORS 72.1060(1) a contract for sale includes both a present sale of goods and a contract to sell goods at a future time. A present sale means a sale which is accomplished by the making of the contract. On the other hand this section provides that a sale consists in the passing of title from the seller for a price. ORS 72.1070(2) provides

that a contract for the sale of growing crops is a contract for the sale of goods and that the parties can by identification effect a present sale before severance of the crop from the land. ORS 72.4010 provides that unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods. Under ORS 72.4020 the rights of unsecured creditors of the seller in identified goods are subject only to the buyer's right to recover the goods upon tender of the balance due when the seller has become insolvent within 10 days after receipt of the first installment on the price and the buyer's right to specific performance where the goods are unique. Under ORS 72.5010 when crops are planted identification occurs and the "buyer obtains a special property and an insurable interest" in the crops. This section also provides that so long as title remains in the seller he retains an insurable interest in the goods. ORS 72.-5090 provides that the risk of loss remains with the seller until the goods have been delivered in accord with the contract. ORS 72.4020(3) provides that nothing in chapter 2 regarding sales shall be deemed to impair the rights of creditors of the seller under chapter 9 on secured transactions.

Turning now to chapter 9 regarding secured transactions as it relates to the facts in this case we find the following:

Under ORS 79.2030 a security interest attaches (1) when the debtor has signed a security agreement (2) value has been given and (3) the debtor has rights in the collateral. The holder of the security interest also has rights to the proceeds. ORS 79.3060(2) provides that the security interest continues in the goods after sale unless the sale was authorized by the secured party. Under ORS 79.3120 priority between conflicting claims of a security interest are ranked according to priority in time of filing or perfection and is not dependent upon knowledge or lack of knowledge of conflicting security interests.

From the provisions of Chapter 2 and 9 of the Uniform Commercial Code mentioned

above the following conclusions can be reached so far as relevant to the facts in this case.

■ The UCC recognizes that it is appropriate to enter into a sale of crops prior to severance of the crops from the land. There is no provision for the filing or perfection of a contract for the sale of growing crops. A sale of farm products does not take effect until title passes. Title does not pass until the seller has made delivery in accordance with the contract. When a contract to sell future farm products is entered both the seller and the buyer have a special and insurable interest in the crops as soon as they are identified by description of the land upon which the crops are to be raised. The risk of loss of the crops remains in the seller until the seller has delivered the crops. Prior to delivery of the crop the rights of unsecured creditors of the seller are subject only to two rights of the buyer. One is the right to specific enforcement of the contract if the goods are unique. The other is the right to complete payment and demand the goods where there has been partial payment and the seller has become insolvent within 10 days after the first installment payment has been made. Nothing in Chapter 2 regarding sales will impair the rights of creditors who have a perfected security interest in the crops. The priority between creditors holding security interests is determined by the time of perfection and is not dependent upon knowledge or lack of knowledge of conflicting claims.

From these conclusions further conclusions regarding the law can be made.

■ The Uniform Commercial Code strives for certainty in commercial transactions. If parties will follow the steps required of them to protect their interests they are assured that they will not be later confronted with factual disputes over such matters as whether a party did or did not have actual knowledge of a claim of another person. Parties should be entitled to rely upon public records to determine whether goods which they wish to purchase or take as collateral are free of the claims of parties other than the seller or debtor. While

a lender may not take a security interest in collateral other than to the extent of the interest of the debtor in the collateral, a lender may take a security interest in growing crops which, upon perfection, will take priority over a purchaser of such crops so long as title has not passed to the seller. A purchaser of future crops will take subject to a security interest perfected prior to passage of title to the purchaser.

These rules are not unreasonable as they effect a purchaser of crops. If the purchaser of future crops wished protection against later perfected security interests, the purchaser at the time of entering the contract could take a perfected security interest. By so doing the purchaser might, however, make it impossible for the seller to obtain from other sources funds needed for the production of the crop. It might be possible to defeat later claims by providing in the contract for the passing of title earlier than delivery of the crop. Prior to taking delivery or making payment the purchaser could check the public records to determine whether the seller had granted security interests to others subsequent to the execution of the contract and refuse delivery or payment unless consent to the sale could be obtained from the holders of perfected security interests.

■ The court therefore concludes that at the time Klein Bros. took delivery of beans raised upon the Three Wells farm in Washington the beans were encumbered by the prior perfected security interest of the Bank which had priority over the interest of Klein Bros.

### CONSENT TO SALE BY BANK

Klein Bros. asserts that the Bank waived its security interest in the crop raised on both farms by unconditionally consenting to the sale by Sunriver to Klein Bros. The Bank asserts that while it consented to the sale its consent was conditioned upon payment by Klein Bros. in the form of checks drawn jointly payable to Sunriver and the Bank.

ORS 79.3060(2) provides:

"... A security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party in a security agreement or otherwise* and also continues in any identifiable proceeds, including collections received by the debtor."

■ Consent may be unconditional or subject to conditions or limitations. If conditions are imposed then a sale in violation of the conditions is an unauthorized sale and the security interest continues in the collateral. *Baker Production Credit Association v. Long Creek Meat Co.,* 266 Or. 643, 513 P.2d 1129 (1973).

Prior to the delivery of any beans to Klein Bros. the bank sent a letter to Klein Bros. requesting that it make all checks payable to the Bank and Sunriver jointly. Although the letter is in polite terms it nonetheless conditioned consent to sale upon payment by checks made jointly payable to the Bank and Sunriver.

■ There was conflicting testimony as to whether the bank or its employees had stated that the bank did not require Klein Bros. to make the checks payable jointly and was merely interested in seeing that upon receipt of payments by Sunriver that it turn such payments over to the Bank. The court finds that no such representations or statements were made and finds that the Bank relied upon its letter to Klein Bros. requesting that all checks be made payable jointly. The court therefore concludes that the Bank did not waive its security interest by unconditionally consenting to the sale of the crops.

Authority to dispose of collateral may be express or implied and the usual common law rules of waiver and estoppel may apply to the secured party. Waiver is the intentional relinquishment of a known right. Estoppel requires reasonable reliance on some act of the other party. The Bank's knowledge of the March 6 contract shortly after the contract was entered and failure to object does not constitute a waiver of any security interest it then held or might thereafter acquire. Klein Bros. made no

payment until the first beans were delivered which occurred long after the bank had perfected its security interest in the crops in both Oregon and Washington. Therefore there was no action taken by Klein Bros. in reliance upon action or inaction by the Bank between the time of the execution of the March 6 contract and the perfection of the Bank's security interest in the Washington crops on July 3, 1980 or thereafter. Receipt of the letter of July 10 on July 15 was acknowledged by Klein Bros. This letter constituted a conditional consent to sale by Sunriver to Klein Bros. Failure of Klein Bros. to make checks payable jointly constituted an unauthorized sale of the beans represented by such payment and amounted to a conversion of collateral by Klein Bros. to that extent.

## PAYMENTS WHICH WERE NOT MADE JOINTLY

There was, during the trial, a dispute concerning a check of September 15, 1980 of $200,000 issued by Klein Bros., jointly to Sunriver and DiSanto Resources. Klein Bros. thereafter took a security interest in other property to secure this payment and does not claim a credit against the purchase price of the beans delivered by Sunriver because of the payment.

■ On September 8, 1980 Klein Bros. issued a check payable solely to Sunriver toward the purchase price of the beans in the amount of $240,000. Klein Bros. asserts that it is entitled to credit for this sum as against the Bank. The evidence was in conflict as to whether the representative of the Bank had ratified this payment. The court finds that the Bank did ratify the payment, that had the Bank not ratified the payment Klein Bros. could and would have at the same time that it took a security interest to cover the $200,000 taken a security interest in additional collateral to secure the $240,000 payment, that, except for an insignificant portion, the proceeds of the $240,000 were applied to purposes which were of benefit to the Bank and that the Bank has not suffered damage as a result

of the issuance of the $240,000 check without making the bank a joint payee. Klein Bros. is therefore entitled to a credit in this sum.

## CLAIMED CREDITS FOR WHEAT SEED

The plaintiff's opening post trial memorandum attaches an appendix which is alleged to be a summary of all invoices rendered by Sunriver to Klein Bros., invoice for wheat seed delivered by Klein Bros., and all payments by Klein Bros.

The appendix contains reference to $48,000 of bean seed invoiced by Klein Bros. to Sunriver Farms, Inc. This matter was settled by a stipulated order entered by the court on March 9, 1982 in which it was agreed that Klein Bros. was entitled to an offset of $48,000.

The appendix also contains reference to invoices for wheat seed. Klein Bros. asserts that it is entitled to set off against the sums owed for purchase of beans, sums owing by Sunriver Farms, Inc., on the invoices for wheat seed. There was no evidence presented showing that Klein Bros. had a perfected security interest in the beans or other collateral to secure these sales of wheat seed. Therefore the invoices for wheat seed totalling $85,603.77 represent an unsecured debt owing to Klein Bros. The Bank's perfected security interest in the beans also constituted a perfected security interest in the proceeds of the sale of the beans by Sunriver to Klein Bros. ORS 79.2010 provides that the Bank's security interest is effective against purchasers of the collateral and creditors. The fact that the collateral is purchased by a creditor of the seller does not permit the purchaser to offset as against the prior secured creditor an unsecured debt owing to the purchaser by the seller. *Imperial N.H. 3, Division of Western Farm Service, Inc., v. Central Valley Feed Yards, Inc.,* 70 Cal. App.3d 513, 139 Cal.Rptr. 8 (1977). In the present case Klein Bros. does not have the right to set off against the Bank's prior perfected security interest sums owing to it upon unsecured claims for wheat seed sold to Sunriver Farms, Inc.

## CROSS–COMPLAINT OF PENDLETON GRAIN GROWERS

This case was first commenced by the filing of a complaint in the Circuit Court of the State of Oregon for Multnomah County and was removed to the court upon application of the defendant, First National Bank of Oregon, now First Interstate Bank of Oregon. The plaintiff thereafter on April 17, 1981, filed in that court a "Complaint in the Nature of Interpleader and for Declaratory Relief." The complaint joined Pendleton Grain Growers, Inc., (erroneously shown as Oregon Grain Growers, Inc.) as a defendant and alleged that Pendleton Grain Growers (PGG) claimed some interest in the pinto bean crop or its proceeds by virtue of a statutory lien covering crops grown by Sunriver. On April 24, 1981 PGG filed an answer and cross-complaint in which it alleges that on October 4, 1980 it furnished pea seed to Sunriver, that it thereafter filed with the recording officer of Morrow County, Oregon a claim of lien on crops of Austrian winter peas and/or other crops grown in the year 1980 and 1981 by Sunriver upon certain described real property, and that PGG thereby held a first and superior lien in the proceeds deposited with the court by Klein Bros. On May 1, 1981 the Bank filed an answer to PGG's cross complaint in which it alleged that Sunriver did not grow Austrian winter peas or any other crop, including pinto beans, on the property described in PGG's claim of lien nor did PGG supply materials for the pinto beans crop. On May 6, 1981 PGG filed an amended answer and cross complaint in which it joined as a cross defendant, Mervin Leonard, the receiver for Sunriver and for Sabre Farms, Inc. In the cross complaint PGG alleged that it furnished to Sunriver on September 8, 1980 Austrian winter pea seed "to aid the growing of 1980 and 1981 crops of Sunriver", that it had filed its notice of lien and that it had a first and superior lien in the proceeds deposited with the court by Klein Bros. On that same date PGG also filed a third party complaint in which it named Mervin Leonard as the third party

defendant and in which it alleged the furnishing of pea seed, the filing of its lien, and that it had a first and superior lien in the crop and proceeds in the hands of Mervin Leonard. The Bank on May 19, 1981 filed an answer to PGG's answer and cross complaint in which it again alleged that Sunriver did not grow Austrian winter peas or any other crop on the property described in PGG's claim of lien nor did PGG supply materials for the pinto bean crop. On June 10, 1981 a stipulation was filed in which all of the parties agreed that Mervin Leonard has no interest in the proceeds of the 1980–81 pinto bean crop and that none of the parties (including PGG) will assert any claim against Mervin Leonard with regard to the 1980–81 pinto bean crop. On March 12, 1982, PGG filed a motion for summary judgment. In support of the motion an affidavit was filed alleging that the pea seed was used as a cover crop after removal of a previous crop grown for 1980 which was important to keep the soil intact as part of the 1980 crop practices and for use as pasture.

On March 18, 1982 a pretrial order was lodged with the court. Those parts of the pretrial order which are relevant to the claim of PGG are as follows. In the agreed facts there are the following paragraphs:

"25. Cross claim defendant Marvin Leonard is the receiver for agricultural products and proceeds among his many responsibilities derived from lands farmed by Sunriver. Marvin Leonard holds agricultural products and proceeds from the 1980 and 1981 crops grown on the Sunriver Farms, Inc., farmlands."

"26. On September 8, 1980, Pendleton Grain Growers, Inc., provided to Sunriver 24,240 pounds of Austrian winter pea seed to aid growing of the 1980–1981 crops of Sunriver. Reasonable charges for the pea seed provided by Pendleton Grain Growers, Inc., was the sum of $2,483.58."

"27. On November 7, 1980, Pendleton Grain Growers, Inc., filed a written notice of claim of lien with the recording officer of Morrow County, Oregon, which is the county in which Sunriver had its principal place of business at the time of supplying the seed to it."

"28. After recording the lien as above described, Pendleton Grain Growers, Inc., on November 11, 1980, mailed to Sunriver by certified mail, a copy of the recorded lien."

"29. Sunriver Farms, Inc., has not paid Pendleton Grain Growers the value received, $2,483.58, and its carrying charges of 1.5 percent per month from October 8, 1980, until paid."

"30. Pendleton Grain Growers, Inc., filed its foreclosure of lien within the statutory time period for filing foreclosure of agricultural liens."

"31. The Pendleton Grain Growers, Inc., claim of lien describes specific land where the Austrian winter peas were seeded. The description included in the Pendleton Grain Growers notice of lien did not include a description of the land where the beans were grown which produced the proceeds in the hands of Klein Bros."

"32. The Austrian winter peas aided in growing the 1980 crops by providing a cover crop after a pasture crop was removed and also was available as pasture for livestock. The Austrian winter peas aided growing of the 1981 crop by providing a cover crop, nitrogen and mulch, for the 1981 crop."

"33. The property described in Pendleton Grain Growers' claim of lien was not owned or leased by Sunriver during 1980."

In the pretrial order PGG contends:

"1. An agricultural services lien covers every crop grown by a lien debtor during a particular crop year even though the lien creditor may not have provided labor, materials or services to every crop."

"2. A legal description in an agricultural services lien does not limit recovery by a lien creditor to crops grown on the property described in the lien."

"3. Pendleton Grain Growers, Inc., has a lien on the crop and proceeds of all crops grown by Sunriver Farms, Inc., 1980 and 1981, which crops and proceeds are in the

possession of Klein Bros., and Marvin Leonard, Receiver."

"4. Pendleton Grain Growers, Inc., should be awarded attorney fees for the foreclosure of its lien along with a judgment for $2,483.58 and carrying charges from October 8, 1980, until paid, at 1.5 percent per month."

At the trial it was stipulated that the claim of PGG could be determined upon the motion for summary judgment and the pleadings in the case.

ORS 87.226 provides that a person who supplies materials on farm land to aid the growing crops have a lien upon the crops for the reasonable or agreed charges for such materials. "Materials" includes seed used in agricultural practice to aid the growing or harvesting of crops. ORS 87.-236 provides that the lien attaches to the proceeds if prior to the filing of the notice of claim of lien the chattels are sold. ORS 87.336 provides for recovery of costs and attorney fees upon foreclosure of the lien.

ORS 87.410, which was repealed in 1969, provided that the notice of claim of lien contain a description of the land upon which crops had been planted or sown.

ORS 87.295, which was enacted in 1969 and repealed in 1975, provided that the notice of claim of lien contain a description of the crop to be charged with the lien and the land upon which it was grown.

ORS 87.242, which was enacted in 1975 and which was in effect at all times relevant to this case, requires that the notice of claim of lien contain "A description of the chattel to be charged with a lien sufficient for identification". It does not specifically require a description of the real property upon which the crop was grown.

PGG admits that the description included in the notice of lien did not include a description of the land where the beans were grown which produced the proceeds in the hands of Klein Bros. It also admits that the property described in the claim of lien was not owned or leased by Sunriver during 1980.

The question then arises whether PGG can claim a lien upon crops raised by Sunriver on lands other than the land described in the notice of claim of lien.

As noted above the statutes in existence prior to 1975 required that the notice of claim of lien contain a description of the land upon which the crops were grown. In 1975 the statute eliminated this requirement and substituted a requirement that the notice contain a description of the chattel sufficient for identification. Because of this change in the requirement of identification of the crop, PGG argues that the description of the real property contained in its notice amounted to mere surplusage which may be ignored in determining whether the notice contains a description of the chattel sufficient for identification.

Had the notice failed to describe the specific land upon which the crops were to be grown, it is possible that the crops would have been described sufficiently for identification had the notice described the crops upon which a lien was claimed as all crops grown upon land owned or leased by Sunriver. But the notice instead limited the claim of lien to crops grown upon certain described real property.

The statute requires a description sufficient for identification in order that third parties may determine upon what chattels a lien is claimed. A reader of the notice in this case would not be put upon notice that PGG was claiming a lien on crops grown on land other than the land specifically described. A reasonable interpretation would be that PGG was not claiming a lien on crops grown on other property. When a lender takes a security interest in accounts receivable there may be reasons why he does not also seek a security interest in inventory or equipment. The fact that a lender could take a security in all three types of collateral would not be notice to a person reading a filed financing statement that the lender claimed a security interest in types of collateral not mentioned in the financing statement. The reader must take notice that a security interest is claimed in collateral described in a financ-

ing statement. On the other hand he has the right to assume that no security interest is claimed in collateral which is not described. In an agricultural lien a reader has the right to assume that a lien is only claimed in the crops described in the notice. When the notice of lien is limited to crops grown on a particular piece of land, the reader has the right to assume, without further investigation, that no lien is claimed upon crops grown on other lands. The description of the land in the notice of lien in this case cannot be treated as surplusage merely because the statute does not require a description of the land upon which the crops are to be grown. The description of the land constitutes a limitation upon the extent of the lien claimed. Since none of the pinto beans were raised upon the land described in the notice of lien, PGG had no lien upon the pinto beans nor upon the proceeds of the sale of the beans. The motion of PGG for summary judgment will be denied and judgment will be entered denying the relief requested by it in its cross complaint.

Since PGG has admitted that the land described in its claim of lien was not owned or leased by Sunriver in 1980 a judgment will be entered denying the relief requested by it in its third party complaint against Mervin Leonard. In the event that PGG has failed to file a proof of claim in this case it is suggested that it do so as an unsecured creditor of Sunriver Farms, Inc.

### BALANCE DUE

As stated in the second paragraph of this opinion it was agreed by the parties that the balance owing by Klein Bros. upon the purchase price of the beans sold to it was $655,451.48 subject only to Klein Bros. assertion of credits or offsets for "cover", the check for $240,000 which was made payable solely to Sunriver, its claim for wheat seed, and the lien asserted by PGG. The court has found above that of these items Klein Bros. is not entitled to credits for "cover" or wheat seed, that PGG has no lien and that Klein Bros. is entitled to a credit for the check of $240,000. The balance owing by Klein Bros. is therefore the sum of $415,-

451.48. The court therefore concludes that judgment should be entered herein in favor of the Bank and against Klein Bros. in the amount of $415,451.48 together with interest thereon at 9% per annum from the date of the judgment. The sum remaining on deposit under earlier order of the court may be paid to the Bank and applied in reduction of such judgment.

This memorandum opinion shall constitute findings and conclusions under Bankruptcy Rule 752.